OPINION
{¶ 1} Defendant-appellant, Gerald L. Brown, Jr., appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of two counts of aggravated burglary, each count with two specifications; three counts of aggravated robbery, each count with two specifications; two counts of attempted murder, each count with two specifications; two counts of felonious assault, each count with two specifications; and two counts of aggravated murder, each count with five specifications.[1]
For the following reasons, we affirm the trial court's judgment and remand the case to the trial court to correct a clerical error.
 {¶ 2} According to the state's evidence,[2] on or about August 14, 2001, LaToya Dixon, who was 16 years old at the time, paged Dennis Michael Williams, aka "Mikey," and invited him to her apartment. At that time, Dixon lived in apartment 2F at 4611 Refugee Road, Columbus, Ohio, in an apartment complex that was then called the Beacon Hill Apartments.
 {¶ 3} Within about an hour, Williams, who was accompanied by male friends whom Williams later introduced to Dixon as "cousins" and with whom Dixon was unfamiliar, arrived at Dixon's apartment complex in two cars. Dixon met Williams and his companions in the parking lot of the apartment complex, and Dixon escorted Williams and his companions to her apartment. At trial, Dixon could not recall Williams' companions' names.
 {¶ 4} One of Williams' companions asked Dixon if he could use her telephone. Dixon agreed. However, when the telephone apparently did not work, Williams' companion attempted to break the telephone. Although Williams attempted to calm Dixon, Dixon became concerned and asked Williams' companion why he was attempting to break her telephone.
 {¶ 5} Dixon, who was now concerned about her safety, then went across the hall to the apartment of a neighbor, Emmitt Grant, and asked for a "Black Mild" cigar. According to Dixon, Grant was aware that Dixon did not smoke and by asking for the cigar Dixon had hoped "to let [Emmitt Grant] know that I felt like something was about to happen in my house." (Tr. 92.) While Dixon was talking with Grant, some of the individuals that Dixon had allowed into her apartment observed Dixon through the peephole.
 {¶ 6} After talking with Grant, Dixon returned to her apartment. Upon returning to her apartment, Dixon and Williams went into the bathroom to talk. The men that accompanied Williams remained in Dixon's living room. At some point, Williams' companions left Dixon's apartment.
 {¶ 7} Dixon and Williams then retired to Dixon's bedroom to have sex. However, Dixon ultimately decided against having sex with Williams and left the apartment. As she exited the apartment, Dixon passed Williams' companions, who were entering Dixon's apartment.
 {¶ 8} After exiting her apartment, Dixon went by the apartment complex's pool and came upon Jerramie Hill and John Hill, who inquired of Dixon what was happening. Dixon told the Hill brothers that she was waiting for Williams and his companions to leave her apartment and "[t]hey were acting crazy." (Tr. 98.) Dixon also told the Hill brothers that they should not intervene.
 {¶ 9} Dixon then began walking with the Hill brothers. At some point, Williams and his companions jumped out from an entryway, surrounded the Hill brothers, and attacked them.
 {¶ 10} Dixon then ran to her apartment to change her clothes, "[b]ecause I didn't have — really have no clothes on. I had like a dress on. I didn't have no shoes or nothing on * * *." (Tr. 100.) She later peered through a broken window into the Hill brothers' apartment. Dixon observed a man with many compact discs in his hand She recognized this man as one of Williams' companions. The apartment was in disarray and there was blood on the walls. Dixon also observed someone being beaten in the bathroom. She also heard screams and stomping sounds from the apartment. Dixon also recognized Williams' voice coming from the Hill brothers' apartment. She did not hear any gunshots, nor did she observe anyone being hit with a commercial blower that purportedly was in the Hill brothers' apartment.
 {¶ 11} Fearing for her own safety, Dixon fled to a friend's house. The next day she contacted police.
 {¶ 12} According to Emmitt Grant, who lived in apartment 2E across from Dixon's apartment, after a female friend with whom Grant had spent the evening left his apartment between 1 and 1:30 a.m. on August 14, 2001, Grant remained in his apartment and played video games. Because the weather was pleasant, he left the door to his apartment open.
 {¶ 13} According to Grant, at approximately 2 a.m. on August 14, 2001, he observed Dixon leave her apartment. Approximately five minutes later, Dixon returned to her apartment and was accompanied by some black males. Approximately five minutes later, Grant observed two men exit Dixon's apartment and go down the stairs. After a couple of minutes, these men returned to Dixon's apartment. Grant also heard one man, upon exiting Dixon's apartment scream, "'Fuck, that. Who is he? Who is he?'" (Tr. 29.)
 {¶ 14} At some point, Grant closed the door to his apartment. As he retreated to his seat, there was a knock at his door. Dixon was at the door and asked Grant for a cigar. She did not appear to be upset. (Tr. 32.) Dixon returned to her apartment and, as she opened the door to her apartment, Grant observed several men in Dixon's apartment.
 {¶ 15} As Grant turned to return to his apartment, one of the men greeted Grant. Grant returned the greeting, entered his apartment, and closed the door. Later, however, because Grant felt that he should not have to close his door, he reopened the door to his apartment and left it halfway open.
 {¶ 16} A few minutes after Grant reopened his door, a man stood in the doorway to his apartment with his back toward Grant. The man looked over his shoulder and inquired as to what Grant was doing. Grant replied that he was playing a Dreamcast game.
 {¶ 17} As the man stood at the doorway, another man entered Grant's apartment without invitation from Grant and stood in front of a table by the couch. Next, the man who had been standing in the doorway entered Grant's apartment also without invitation and swung at Grant. A fight ensued. Two other men entered Grant's apartment and attacked Grant. During the fight, Grant saw a person run toward the back of his apartment. This same person slammed Grant's entertainment center to the floor.
 {¶ 18} During the fight, Grant observed a gun fall from the hip of the person that had first swung at him. Grant then heard others in the background scream, "`Get your gun, get your gun.' * * * He's about to get your gun.'" (Tr. 38.) Grant's hand was then kicked away from the gun that had hit the floor. A cable cord from Grant's videocassette recorder ("VCR") was wrapped around Grant's neck, and later an attacker hit Grant's head with a little table. After being struck three times in the head with the table, Grant fell to the floor. The man that had wrapped the cord around Grant's neck then said, "`Fuck it. Let's drag his ass to the back.'" (Tr. 39.) In court, Grant could not identify defendant as one of the men who had been in his apartment. (Tr. 86.)
 {¶ 19} At some point, Grant escaped from his attackers. Grant ran across the apartment complex to an apartment that was illuminated. An elderly resident came to the door. Grant asked the resident to call Grant's family or friends. Instead, the resident called 911.
 {¶ 20} Officers Patrick Seaman and Aaron Dennis of the Columbus Division of Police responded to the location where the 911 call was placed by the elderly resident. Earlier police had also received another call from the resident in the apartment below Grant's apartment concerning a commotion or fight in Grant's apartment. After viewing Grant, Officers Seaman and Dennis summoned paramedics to attend to Grant's injuries.
 {¶ 21} Officers Seaman and Dennis then went to Grant's apartment to investigate and secure the crime scene. When Officers Seaman and Dennis arrived at Grant's apartment, Officer Seaman observed that the apartment was torn apart and it appeared that a fight had occurred in the apartment. In the bedroom, Officers Seaman and Dennis found what appeared to be crack cocaine on a plate on a dresser. Officers Seaman and Dennis found no suspects in Grant's apartment.
 {¶ 22} While Officer Dennis remained at Grant's apartment, Officer Seaman returned to the location where the paramedic was treating Grant. Officer Seaman, along with a paramedic, then escorted Grant back to his apartment. During the walk to Grant's apartment, Officer Seaman saw a PlayStation game on the grass in the courtyard near another apartment. Because it was unusual to see an unattended PlayStation game in the middle of the grass, Officer Seaman remained to investigate while the paramedic and Grant continued toward Grant's apartment.
 {¶ 23} Near the location where the PlayStation game was found, Officer Seaman noticed a ground floor apartment with an open window. Because it was unusual to have a wide-open window in a ground floor apartment in this particular apartment complex that had a high crime rate, Officer Seaman went to the apartment to investigate. Looking through the window, Officer Seaman observed debris in the apartment. Next, Officer Seaman noticed that the door to the apartment was wide open. Officer Seaman radioed his location. Shortly afterward, Officer Seaman noticed blood on the door and a blood trail that appeared to start from the apartment and continue through the stairwell.
 {¶ 24} After announcing his presence, Officer Seaman entered the apartment. The apartment was torn apart and there was blood on the walls. As Officer Seaman passed the bathroom, he saw blood and noticed the bathroom was torn apart. As Officer Seaman entered the bedroom, he saw one white male, Jerramie Hill, curled in a fetal position on the bed and covered in blood. Another white male, John Hill, who was also covered in blood, was lying facedown on the floor. Officer Seaman radioed his findings. Officer Dennis, who had been in Grant's apartment, then left Grant's apartment to assist Officer Seaman.
 {¶ 25} Officer Seaman observed shell casings and one spent bullet. Next to John Hill, Officer Seaman noticed a pool of blood on the floor and a bullet wound on the body with burn marks around it. According to Officer Seaman, John Hill was dead.
 {¶ 26} Officer Seaman initially believed Jerramie Hill, who appeared badly beaten, was also dead. However, after determining Jerramie Hill was alive, Officer Seaman summoned a paramedic.
 {¶ 27} According to Jerramie Hill, a witness for the state, he and his brother, John Hill, were walking in the apartment complex when they saw Dixon standing underneath some steps. Dixon appeared upset and the Hill brothers asked her what she was doing. Dixon responded that there were some individuals in her apartment. While Jerramie and his brother were walking with Dixon toward their apartment, four black males confronted Jerramie Hill and his brother. The men stopped the Hill brothers, asked the brothers to put their arms in the air, and patted them down. Then one man punched John Hill in the mouth and cut his lip. John Hill went toward some steps and spit blood out of his mouth. Then the Hill brothers went to their apartment.
 {¶ 28} At the apartment, John Hill went to the bathroom to clean his lip. As Jerramie Hill was trying to shut the screen to a window that had been broken the night before, one of the individuals that had stopped the Hill brothers came in through the broken window, opened the front door to the apartment, and let in the other two members of the group that had earlier confronted the Hill brothers.
 {¶ 29} After members of the group entered the apartment, the intruders queried Jerramie Hill about items in the apartment. Jerramie Hill attempted to represent that the items did not belong to him and he told the intruders they could take the items, such as a television and a Sega Dreamcast game system. The intruders questioned Jerramie Hill about who was in the apartment's back room. Jerramie Hill informed the intruders that his brother was in the back room.
 {¶ 30} The intruders ordered Jerramie Hill to help them carry items out of the apartment. At one point, Jerramie Hill attempted to flee the apartment.
 {¶ 31} One of the intruders grabbed Jerramie Hill, threw him to the floor and began to stomp on his head. Two other intruders went to the back of the apartment. According to Jerramie Hill, during the attack he drifted in and out of consciousness. However, Jerramie Hill recalled being hit over the head with a carpet blower that had been placed in his apartment to dry the carpet because the apartment previously had been flooded. Hill did not hear any gunshots.
 {¶ 32} Jerramie Hill regained consciousness while paramedics were attending to his injuries. According to Hill, he was hospitalized for more than a week following the attack, and that due to the attack his "balance is not the same." Further, he stated, "I've lost three of my jobs 'cause my movement wasn't fast enough." (Tr. 227.) Hill could not identify any of the intruders.
 {¶ 33} According to the state, in addition to the attacks of the Hill brothers and Grant, items were also stolen from the Hill brothers' apartment and from Grant's apartment. According to Jerramie Hill, a television, compact discs, a dragon statue, and a Sega Dreamcast system were missing from his apartment. According to Grant, clothes, shoes, boots, a PlayStation 1 video game machine, Sega Dreamcast video game machine, a video game, jewelry, and a cell phone were missing from his apartment.
 {¶ 34} At trial, portions of a videotaped interview of defendant that was conducted on November 6, 2001, by Detective Carl Rankin of the Columbus Police Department were played and transcribed into the record. Detective Rankin also testified at trial. According to Detective Rankin, following Grant's assault, he had linear bruising from ear to ear, which was consistent with Grant's account of being choked with the VCR cable cord.
 {¶ 35} According to Detective Rankin, prior to interrogating defendant, defendant voluntarily waived his constitutional rights under Miranda.[3] During the videotaped interview, defendant provided police with his factual account of the events of August 14, 2001. At the interview, defendant admitted to involvement with the attacks of Grant and the Hill brothers. However, defendant denied killing John Hill.
 {¶ 36} According to Dr. Dorothy E. Dean, forensic pathologist and deputy coroner, based upon her evaluation, John Hill sustained blunt-force injuries and eight entrance gunshot wounds, although two of these entrance gunshot wounds may have been reentry wounds, thereby suggesting he had been shot six times in total. According to Dr. Dean, John Hill died from bullet wounds to his torso that injured his heart and arteries. Based upon the autopsy, Dr. Dean opined that John Hill had not been beaten severely prior to his death.
 {¶ 37} In contrast to the state's evidence, defendant presented a differing version of the events of August 14, 2001.[4]
 {¶ 38} According to defendant, on the evening of August 14, 2001, LaToya Dixon paged Mikey Williams, a "cousin" of defendant, and invited Williams to Dixon's apartment. At the time Williams received Dixon's page, Williams was with defendant, James Ingram, aka "Rock," and Cortez Smith. Prior to this time, defendant was not acquainted with Cortez Smith.
 {¶ 39} Defendant, who had been drinking, James Ingram, and Cortez Smith accompanied Williams to Dixon's apartment. Defendant and Ingram rode with Williams while Smith drove another vehicle and followed the others to Dixon's apartment.
 {¶ 40} Although Dixon did not know Williams' companions, she allowed Williams and his companions to enter her apartment. According to defendant, there may have been an understanding between Williams and his companions that they would have sex with Dixon.
 {¶ 41} At one point, Dixon left her apartment and later returned. After the planned sex did not materialize, defendant, Ingram, and Smith left Dixon's apartment. Williams remained in the apartment.
 {¶ 42} While defendant and the others were outside Dixon's apartment, defendant and Emmitt Grant exchanged stares and words. Defendant informed Williams about the encounter with Grant. Defendant, Williams, and Ingram then entered Grant's apartment and fought with Grant. Williams was the first person to punch Grant. During the fight, defendant held Grant and punched him in the ribs while Ingram punched Grant in the face. During the fight, defendant did not know the whereabouts of Smith. At some point, Grant escaped and fled. Williams pursued Grant. Defendant and Ingram followed.
 {¶ 43} Defendant, Ingram, and Smith then came upon the Hill brothers. A fight ensued and continued in the Hill brothers' apartment. Defendant admits that he beat Jerramie Hill while he was in the Hill brothers' apartment and that he struck John Hill. However, defendant denies that he struck Jerramie Hill with a commercial blower or that he ever threatened the use of a handgun. Defendant also claimed he was not in the bedroom when John Hill was shot. According to defendant, he did not shoot John Hill, nor did he hear any gunshots.
 {¶ 44} After fighting with the Hill brothers, defendant, along with Williams, Ingram, and Smith, headed toward Williams' car. Smith, however, decided to return to the apartments to steal a video game. Because Smith was gone awhile, defendant searched for him. While searching for Smith, defendant reentered the Hill brothers' apartment and observed that neither Jerramie Hill nor John Hill was moving. Smith was not in the Hill brothers' apartment.
 {¶ 45} Defendant then observed Smith coming downstairs from the area of Grant's apartment. Smith was carrying a video game. Defendant also observed a shiny object in Smith's hand, which Smith put in his pocket. Defendant believed the shiny object was a gun.
 {¶ 46} Defendant, Williams, Ingram, and Smith then left the apartment complex. Defendant and Ingram rode with Williams, while Smith drove away separately.
 {¶ 47} According to Tom Stanley, a fire department paramedic who attended to Emmitt Grant on August 14, 2001, the courtyard where Grant was examined was dark and Stanley could not recall observing any bruising along Grant's neck. Cf. testimony of Detective Rankin who testified Grant had bruising on his neck. (Tr. 359.) Additionally, according to Stanley, Grant refused to be transported to the hospital.
 {¶ 48} Detective Edward Cox of the Columbus Police Department testified regarding the arrest of Cortez Smith related to a series of robberies that occurred in November 2001. Detective Cox also testified about the items that were recovered from Smith at the time of his arrest in November 2001. These items included two chrome .32 caliber semiautomatic pistols and a pair of red work boots. However, according to earlier cross-examination testimony of Detective Rankin in the state's case in chief, although a .32 caliber weapon was used in the killing of John Hill, the weapons recovered from Smith in November 2001 were not the weapons used in the killing of John Hill. (Tr. 387.)
 {¶ 49} Officer Aaron Dennis of the Columbus Police Department testified that he did not observe any linear bruising of Emmitt Grant's neck. According to Officer Dennis, after he and Officer Seaman investigated Grant's apartment, both he and Officer Seaman returned to Grant, who was receiving medical treatment by paramedics. He and Officer Seaman intended to escort Grant to his apartment and question him about the events that occurred in his apartment and about the suspected crack cocaine that Officers Seaman and Dennis found in his apartment.
 {¶ 50} According to Officer Dennis, he and Grant headed toward Grant's apartment while Officer Seaman stayed behind. While Officer Dennis was with Grant in Grant's apartment, Officer Dennis heard Officer Seaman's radio transmissions. After hearing Officer Seaman's second radio transmission, Officer Dennis left to assist Officer Seaman.
 {¶ 51} Approximately 20 minutes later, Officer Dennis returned to Grant's apartment. After returning to Grant's apartment, Officer Dennis noticed that the suspected crack cocaine that was in Grant's bedroom was no longer there.
 {¶ 52} Cortez Smith, who at the time of his testimony was incarcerated related to charges arising from the circumstances of this case as well as another case and who had entered into a plea agreement with the state, testified that he stole a Sega Dreamcast video system, a video game, and clothes, including red boots, from Emmitt Grant's apartment. On direct examination, Smith admitted to a history of substance abuse, which included the use of alcohol, "weed," ecstasy, and cocaine. (Tr. 518.)
 {¶ 53} According to Smith, on the morning of August 13, 2001, he had used alcohol, marijuana, and ecstasy. Later that same day, Smith went to an apartment where he met Williams, Ingram, defendant, and others. According to Smith, at that apartment, alcohol was consumed and there also might have been cocaine use.
 {¶ 54} From this apartment, Smith drove in a separate car to the Beacon Hill apartment complex, while Williams, defendant, and Ingram rode to the Beacon Hill apartment complex in Williams' car. According to Smith, the first time he met LaToya Dixon was on the night of August 14, 2001, in her apartment. Smith confirmed that a fight had occurred in Emmitt Grant's apartment, but Smith did not recall hearing anyone state, "Let's open him [Grant] up" or words that could be vaguely construed as this.
 {¶ 55} According to Smith, he was in Grant's apartment approximately three to five minutes. After taking the Sega Dreamcast video system and other items, Smith testified he went to the car that he was driving and put the stolen items into the backseat. Then, according to Smith, he returned to both Grant's apartment and Dixon's apartment and found no one there. Smith then left. According to Smith, he was at the Beacon Hill apartment complex a total of approximately 15 to 20 minutes. According to Smith, when he left the apartment complex, Williams' car was still in the parking lot.
 {¶ 56} On cross-examination, Smith testified that he observed defendant and the others fighting Emmitt Grant in the living room of Grant's apartment. According to Smith, he entered Grant's apartment after the fight had begun. After entering Grant's apartment, Smith went to Grant's bedroom to investigate whether there was anything of value that he could steal. Smith admitted to stealing items from Grant's closet, but he denied rummaging through Grant's dresser drawers. After stealing items from Grant's bedroom, Smith stole a Sega Dreamcast video system on his exit from Grant's apartment.
 {¶ 57} On redirect examination, Smith testified that he recalled seeing the Hill brothers; however, Smith did not recall exactly when he saw them.
 {¶ 58} According to Smith, during the fight in Grant's apartment, a gun dropped to the floor. Smith did not pick up the gun, but he did observe someone else pick up the gun. Smith described the gun that fell to the floor as "[l]ike them guns that Germans have in them old German movies, like — like dark — dark black, like a black gun. I think it was a wood handle with like funny kind of — kind of nozzle on it or barrel, whatever you call it." (Tr. 558-559.) According to Smith, he thought he had seen the gun earlier in the evening. Smith denied handling the gun.
 {¶ 59} By an 11-count indictment filed November 15, 2001, defendant was charged with two counts of aggravated burglary, each count with two specifications; three counts of aggravated robbery, each count with two specifications; two counts of attempted murder, each count with two specifications; two counts of felonious assault, each count with two specifications; and two counts of aggravated murder, each count with five specifications.
 {¶ 60} On September 6, 2002, defendant waived his right to a jury trial and elected to be tried by the court. A panel of three judges was assigned to hear the case.
 {¶ 61} On September 17, 2002, the lead prosecutor filed an affidavit that requested the disqualification of one judge who was assigned to the three-judge panel that was scheduled to hear the case. On October 9, 2002, the Chief Justice of the Supreme Court of Ohio denied the requested disqualification of the assigned panel member.
 {¶ 62} A trial was held in late November 2002. The three-judge panel found defendant guilty of all charges in the indictment. However, with respect to count ten, aggravated murder as it related to aggravated burglary, the panel found defendant was not the principal offender in the commission of the aggravated murder and the aggravated murder was not committed with prior calculation or design. Furthermore, with respect to count eleven, aggravated murder as it related to aggravated robbery, the panel found defendant was not the principal offender in the commission of the aggravated murder and the aggravated murder was not committed with prior calculation and design.
 {¶ 63} Finding that several mitigating factors existed according to a preponderance of the evidence, the trial court excluded the death penalty as a possible sentence. Instead, the trial court sentenced defendant to life with no consideration for parole for 69 years.
 {¶ 64} Following the trial, the trial court appointed other counsel to represent defendant on appeal. From the trial court's judgment of January 15, 2003, defendant timely appeals.
 {¶ 65} Defendant assigns two errors:
ASSIGNMENT OF ERROR I
Appellant's convictions were not supported by sufficient evidence, thereby violating Appellant's due process rights, under Section 10, Article I of the Ohio Constitution and the Fifth andFourteenth Amendments to the United States Constitution.[5]
ASSIGNMENT OF ERROR II
The trial court commits reversible error when it sentences Appellant for aggravated murder, when its judgment entry states that Appellant was guilty of attempted aggravated murder.
 {¶ 66} Defendant's first assignment of error asserts the judgment is not supported by sufficient evidence.
 {¶ 67} When an appellant challenges his or her conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds inState v. Smith (1997), 80 Ohio St.3d 89; State v. Conley
(Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 68} A defendant will not be entitled to reversal on grounds of insufficient evidence because inconsistent testimony was heard at trial. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. See, also, State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, motion for delayed appeal denied (1998), 83 Ohio St.3d 1463. "A jury, as finder of fact, may believe all, part, or none of a witness's testimony."Raver, at ¶ 21, citing State v. Antill (1964),176 Ohio St. 61, 67.
 {¶ 69} Defendant's first assignment of error challenges defendant's convictions concerning the following counts: count 2 (aggravated robbery of Emmitt Grant); count 3 (attempted murder of Emmitt Grant); count 6 (aggravated robbery of Jerramie Hill); count 7 (aggravated robbery of John Hill); count 8 (attempted murder of Jerramie Hill); count 10 (aggravated murder of John Hill); and count 11 (aggravated murder of John Hill). Additionally, defendant challenges all gun specification convictions.
 {¶ 70} Defendant does not challenge his convictions related to count 1 (aggravated burglary concerning Emmitt Grant); count 4 (felonious assault of Emmitt Grant); count 5 (aggravated burglary concerning the Hill brothers); and count 9 (felonious assault of Jerramie Hill).
 {¶ 71} For its part, the state contends there is sufficient evidence to support a finding that defendant was either a principal offender or an aider and abettor regarding all the crimes for which defendant was charged and, therefore, defendant's convictions are proper.
 {¶ 72} In State v. Ratkovich, Jefferson App. No. 02-JE-16, 2003-Ohio-7286, at ¶ 10 (Vukovich, J., dissenting), the court observed the following:
A charge of complicity may be stated in terms of the complicity statute or in terms of the principal offense. R.C. 2923.03(F). Although a defendant may be charged in an indictment as a principal, the court may instruct the jury on complicity where the evidence at trial reasonably supports a finding that the defendant was an aider or abettor. State v. Gonzales, 1st Dist. No. C-010757, 2002-Ohio-4937, at ¶ 51.
 {¶ 73} The Ratkovich court further observed:
"* * * [T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson (2001), 93 Ohio St.3d 240,245-246. * * * The defendant's intent may be inferred from the circumstances surrounding the crime. Id. at 246. * * * The defendant's " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" Id. at 245, quoting State v. Pruett
(1971), 28 Ohio App.2d 29, 34. * * *
Id. at ¶ 15.
 {¶ 74} Count 2 of the indictment charged defendant with aggravated robbery of Emmitt Grant; count 6 of the indictment charged defendant with aggravated robbery of Jerramie Hill; and count 7 of the indictment charged defendant with aggravated robbery of John Hill.
 {¶ 75} Pursuant to R.C. 2911.01:
(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
(3) Inflict, or attempt to inflict, serious physical harm on another.
* * *
(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.
(D) As used in this section:
(1) "Deadly weapon" and "dangerous ordnance" have the same meanings as in section 2923.11 of the Revised Code.
See, also, former R.C. 2913.01(K) (definition of "theft offense");[6] former R.C. 2923.11(A) (definition of "deadly weapon").[7]
 {¶ 76} Here, defendant does not challenge his convictions of aggravated burglary[8] as contained in counts 1 and 5 of the indictment concerning Emmitt Grant and the Hill brothers. Therefore, for purposes of this analysis, we construe this failure to contest these convictions as a concession that defendant is culpable for the aggravated burglaries for which he was convicted. See former R.C. 2913.01(K) (defining R.C. 2911.11
[aggravated burglary] as a "theft offense"). See, generally, R.C.2911.01(A), aggravated robbery (providing that "[n]o person, in attempting or committing a theft offense * * * shall do any of the following * * *").
 {¶ 77} Furthermore, there is evidence that a gun was present during the aggravated burglaries that occurred in Grant's apartment and the Hill brothers' apartment and for which defendant has conceded culpability. (Tr. 38, 407, 558-559.) See, generally, R.C. 2911.01(A)(1) (aggravated robbery) (providing that "[n]o person, in attempting or committing a theft offense * * * shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it").
 {¶ 78} With the evidence construed in the prosecution's favor, there is no evidence that defendant himself possessed or had under his control a gun during the aggravated robberies of August 14, 2001, and therefore the evidence does not support a finding that defendant was a principal offender with respect to the charges of aggravated robbery.
 {¶ 79} The issue thus resolves to whether defendant aided and abetted the principal in the commission of the aggravated robberies. We must therefore determine whether the evidence "show[s] that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal[,]" State v. Johnson (2001),93 Ohio St.3d 240, syllabus, while recognizing that criminal intent "may be inferred from the circumstances surrounding the crime." Id.
 {¶ 80} For his part, defendant contends he did not assist Smith with the theft of items from Grant's apartment. Defendant further contends he lacked awareness that items were stolen from the Hill brothers' apartment, and defendant contends he did not assist with the theft of items from their apartment.
 {¶ 81} Here, construing the evidence in favor of the prosecution, by restraining and assaulting Grant in Grant's apartment while Smith burglarized Grant's apartment and by assaulting Jerramie Hill in the Hill brothers' apartment while one of defendant's companions burglarized the Hill brothers' apartment (see Tr. 99, 100-101) (testimony of LaToya Dixon that she observed one of defendant's companions with a handful of compact discs in the Hill brothers' apartment), we find defendant was connected to or involved with the aggravated robberies of both Grant and the Hill brothers. Therefore, construing the evidence in favor of the prosecution, we find a trier of fact reasonably could conclude defendant supported, assisted, or cooperated in the aggravated robberies of Grant and the Hill brothers. Cf. Johnson, supra, at 243, quoting State v. Widner
(1982), 69 Ohio St.2d 267, 269 (observing that " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' * * * This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission").
 {¶ 82} Moreover, construing the evidence in favor of the prosecution, we find a trier of fact reasonably could conclude defendant's conduct after the aggravated robberies demonstrated defendant's criminal intent. For example, rather than immediately leaving the scene after participating in the events in Grant's apartment and the Hill brothers' apartment, defendant delayed leaving the apartment complex and searched for Smith, who apparently had returned to Grant's apartment to steal a video game, before defendant left the apartment complex. Thus, by searching for Smith, defendant provided overt assistance to the criminal enterprise that included the aggravated robberies. SeeState v. Cartellone (1981), 3 Ohio App.3d 145, 150 (stating that "[e]vidence of aiding and abetting another in the commission of crime may be demonstrated by both direct and circumstantial evidence. * * * Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout"). See, also, Johnson, supra, at 245, quotingState v. Pruett (1971), 28 Ohio App.2d 29, 34 (agreeing with "the proposition that `[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed'").
 {¶ 83} Accordingly, defendant's contention that his convictions of aggravated robbery as related to counts 2, 6, and 7 of the indictment are not supported by sufficient evidence is not well-taken.
 {¶ 84} Defendant also challenges his convictions concerning the following counts: count 3 (attempted murder of Emmitt Grant) and count 8 (attempted murder of Jerramie Hill).
 {¶ 85} R.C. 2903.02 defines the crime of murder. Under R.C.2903.02(A), "[n]o person shall purposely cause the death of another * * *" and, under R.C. 2903.02(B), "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or2903.04 [involuntary manslaughter] of the Revised Code." Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 86} R.C. 2923.02(A) provides a definition of attempt: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 87} Here, construing the evidence in favor of the prosecution, defendant admitted to punching Grant in the ribs and restraining Grant while defendant's companions punched Grant, struck Grant three times in the head with a table, and wrapped a cable cord around Grant's neck, which resulted in ligature marks. Moreover, defendant admitted to assaulting Jerramie Hill severely enough that Hill lost consciousness and defendant injured his hand (See Tr. 297-298.) (Defendant admitting in a videotaped interview that he was face-to-face with Jerramie Hill and that "[he was] hitting him — hitting him, hitting him — just * * * hitting him" and "I think he was probably was unconscious or something, 'cause I hit him a pretty good amount of times with my hand 'cause like I said, my whole — I mean, I was at work, and I had to go home because my whole hand was swollen * * *.")
 {¶ 88} Therefore, construing the evidence in favor of the prosecution, we find a trier of fact reasonably could conclude that defendant engaged in conduct that, if successful, would result in purposely causing the deaths of Emmitt Grant and Jerramie Hill.
 {¶ 89} Accordingly, finding sufficient evidence to support convictions of attempted murder concerning Emmitt Grant and Jerramie Hill, defendant's contention that his convictions of attempted murder as related to counts 3 and 8 of the indictment are supported by insufficient evidence is therefore not well-taken.
 {¶ 90} Besides challenging the convictions related to aggravated robbery and attempted murder, defendant also challenges his convictions of aggravated murder as contained in counts 10 and 11 of the indictment.
 {¶ 91} Pursuant to former R.C. 2903.01,[9] which was in effect at the time of John Hill's murder:
(A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.
(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape.
* * *
(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.
 {¶ 92} Here, we find there is no evidence that defendant purposely, and with prior calculation and design, caused the death of John Hill (see former R.C. 2903.01[A]), nor is there evidence that defendant purposely caused the death of John Hill while committing or attempting to commit one of the enumerated crimes under former R.C. 2903.01(B).
 {¶ 93} Therefore, construing the evidence in favor of the prosecution, we must determine whether there is sufficient evidence that defendant aided and abetted the principal in the aggravated murder of John Hill. For defendant to have aided and abetted the principal in the aggravated murder of John Hill, the evidence must show that defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder and that defendant shared the criminal intent of the principal to commit aggravated murder. SeeJohnson, supra, at 245-246.
 {¶ 94} In State v. Palfy (1967), 11 Ohio App.2d 142, the Ninth District Court of Appeals considered whether there was sufficient evidence to support a defendant's conviction of murder in the first degree. In Palfy, John Palfy, Jr., Ray Pemberton, Ray Kling, Vernon Boyd, and Merle Pemberton drove a car to Summit County, Ohio, from an adjoining county to borrow money from a friend of Ray Pemberton. When the person who loaned the money inquired about repayment, Ray Pemberton, in the presence of all his companions, told the person who loaned the money that they would "roll" some people, obtain money, and repay the loan.
 {¶ 95} Palfy and his companions then visited several bars looking for prospective victims. While riding from one bar to another, Palfy and his companions observed a man named Eric Silket walking on the sidewalk with a package under his arm. Ray Kling and Vernon Boyd, each of whom wore metal knuckles, alighted from the car, assaulted Silket with their armored fists thereby seriously injuring Silket, stole the merchandise in Silket's package, placed the merchandise in the car, and continued to cruise the streets and bars to look for another victim.
 {¶ 96} At a bar called the City Bar, Palfy, Ray Pemberton and Kling met a customer named Ivan Ward, who agreed to travel with the group to another bar. When Palfy and his companions and their most recent acquaintance reached the vicinity of the other bar, Palfy and his companions, who used metal knuckles, severely assaulted Ward, robbed him, dropped him from the car, and again severely beat him.
 {¶ 97} Because the clothing of Palfy and his other companions were saturated with blood, they went to a laundry to launder their clothes. The following morning Ward's wallet, along with various personal papers, was found in the toilet of the laundry after the wallet had been stripped of its money.
 {¶ 98} After leaving the laundry, Palfy and his companions cruised the streets of Akron, Ohio. They observed Paul Morlan who was walking on the sidewalk near his home. Ray Pemberton and Kling, who were armed with metal knuckles, alighted from the car and accosted Morlan. Morlan was robbed of his money and, in an accompanying altercation, Ray Pemberton intentionally killed Morlan by stabbing him several times with a knife. At the time Morlan was stabbed, Palfy was the driver of the car. Later, Palfy and his companions were arrested after police had been alerted to the killing of Morlan. Palfy was later tried and convicted of first degree murder.
 {¶ 99} On appeal, it was argued that:
[A]lthough Paul Morlan was purposely killed by Ray Pemberton, there is no evidence that Paul Morlan was purposely killed by John Palfy, Jr. Specifically, the appellant says: "We do concede that the defendant knew that the other individual besides Ray Pemberton who participated in the attack on Paul Morlan, which attack resulted in the death of Paul Morlan, did have a pair of `brass knuckles.' The record, however, is absolutely silent as to any attack on Morlan by the use of `brass knuckles,' and, in fact, the record is definite that the death of Morlan was by the knife which Ray Pemberton had, and which knife was unknown to defendant Palfy."
Id. at 145.
 {¶ 100} In affirming Palfy's conviction, the Palfy court construed former R.C. 2901.01, which in pertinent part provided that "`No person shall purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or attempting to perpetrate rape, arson, robbery, or burglary, kill another.'" Id. at 145-146. Cf. former R.C. 2903.01(B), aggravated murder, which was in effect at all times pertinent to the proceedings of the instant case (providing that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape").
 {¶ 101} Additionally, the Palfy court also construed former R.C. 1.17, which provided that "`[a]ny person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender.'" Palfy, at 146. Cf. R.C. 2923.03(A) and (F) (providing that no person, acting with the kind of culpability required for the commission of the offense shall aid or abet another in committing the offense and whoever violates this section is guilty of complicity and shall be prosecuted and punished as if he were a principal offender).
 {¶ 102} Observing that Palfy stood on trial for first degree murder by virtue of the "aiders and abettors" statute then in effect, the Palfy court noted the following:
We understand the law to be, in respect to an aider and abettor under the statute, that where a person engages himself as a participant with others to commit unlawful acts by the use of deadly weapons, or force and violence of such character as would reasonably be expected to cause the death of another, or if the conspired unlawful act, and the manner of its performance, would be reasonably likely to cause death, each participant in the conspiracy is, under the statute, equally guilty with the principal killer, even though the aider and abettor had no knowledge of the actual weapon used by the killer.
Id. at 146.
 {¶ 103} Acknowledging that there was no evidence that Palfy had knowledge that the killer possessed a knife that was used to kill Morlan, the Palfy court also observed that Palfy did know that each robbery was accompanied with great violence upon the victims, and that brass knuckles were generally used. Id.
 {¶ 104} Citing State v. Farmer (1951), 156 Ohio St. 214, the Palfy court stated that "[i]t is well established that one may be presumed to intend the results which are the natural consequences of his voluntary acts." Id. at 146. Applying this principle, the Palfy court found sufficient evidence beyond a reasonable doubt that Palfy had engaged in a common design with the others to rob persons, including Morlan, by the use of force, violence, and weapons (brass knuckles), and that Morlan's murder was a natural and probable consequence of the execution of the common design, and that the common design created such a circumstance that, in all probability, would endanger human life. Id. at 146-147.
 {¶ 105} In its decision, the Palfy court also incorporated paragraph two of the syllabus of State v. Doty (1916),94 Ohio St. 258, as authority in support of finding an aider and abettor guilty of homicide, even though an aider or abettor had no knowledge of the specific weapon used in the killing. Id. at 147. See id. quoting Doty, at 258 ("`* * * if the conspired unlawful act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used' "). See, also, State v. Jester (1987), 32 Ohio St.3d 147, 152, certiorari denied (1988), 484 U.S. 1047, 108 S.Ct. 785, citingState v. Clark (1978), 55 Ohio St.2d 257, syllabus, certiorari denied (1979), 440 U.S. 950, 99 S.Ct. 1431, and State v.Johnson (1978), 56 Ohio St.2d 35 (observing that "[the court] has previously held that, where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill"); State v.Lockett (1976), 49 Ohio St.2d 48, 58-62, judgment reversed in part (1978), 438 U.S. 586, 98 S.Ct. 2954, to the extent the judgment in Lockett sustained imposition of death penalty (finding appellant who participated in the planning and commission of a robbery and acquiesced in the use of a deadly weapon to accomplish the robbery had a purposeful intent to kill).[10]
 {¶ 106} In this case, defendant participated in the assault of Emmitt Grant during which a gun fell from the pants of one of Emmitt Grant's assailants and landed upon the floor of Grant's apartment. During the fight, Grant heard others in the background scream, "`Get your gun, get your gun.' * * * 'He's about to get your gun.'" (Tr. 38.) Grant's hand was then kicked away from the gun that had hit the floor. Furthermore, Cortez Smith testified that he saw an unidentified person pick up a gun after it dropped to the floor. (Tr. 552-553.)
 {¶ 107} Based upon this evidence, we find a trier of fact reasonably could infer that defendant was aware that someone in the group may have had a gun when defendant and his companions later committed crimes in the Hill brothers' apartment, which resulted in the shooting and death of John Hill. Furthermore, under these circumstances, we find a trier of fact reasonably could infer defendant acquiesced in the use of a gun. Cf.Palfy, at 145 (wherein Palfy claims he had no knowledge that Ray Pemberton had a knife).
 {¶ 108} Moreover, construing the evidence in favor of the prosecution, because the endangerment of John Hill's life began in the apartment courtyard wherein John Hill and his brother were accosted, and then in apparently short order the endangerment progressed to the Hill brothers' apartment where John Hill was murdered, we find that a trier of fact reasonably could find that the attack on the Hill brothers in their apartment, which resulted in the murder of John Hill, was a natural and probable consequence of the attack that had initially begun in the courtyard.
 {¶ 109} Additionally, we find that, beyond a reasonable doubt, a trier of fact reasonably could conclude that defendant engaged in a common design with others to rob the Hill brothers by the use of force and violence, and that John Hill's murder was a natural and probable consequence given the force and violence used in the robbery, which created circumstances that in all probability would endanger human life.
 {¶ 110} Accordingly, finding the reasoning of Palfy
persuasive, we find sufficient evidence showing that defendant, through his participation in the crimes that occurred in the Hill brothers' apartment, supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder, and that defendant shared the criminal intent of the principal in the purposeful killing of John Hill. SeeJohnson, 93 Ohio St.2d 240, at 245-246.
 {¶ 111} Consequently, defendant's contention that insufficient evidence supports his convictions of aggravated murder as contained in counts 10 and 11 of the indictment is not persuasive and is not well-taken.
 {¶ 112} Having found defendant's challenges to count 2 (aggravated robbery of Emmitt Grant); count 3 (attempted murder of Emmitt Grant); count 6 (aggravated robbery of Jerramie Hill); count 7 (aggravated robbery of John Hill); count 8 (attempted murder of Jerramie Hill); count 10 (aggravated murder of John Hill); and count 11 (aggravated murder of John Hill) are without merit, we next consider defendant's challenge to all gun specification convictions.
 {¶ 113} Here, defendant contends there is no evidence that defendant had prior knowledge that any of his companions had a gun; defendant took no part in the shooting of John Hill; and defendant fled the scene after observing that Cortez Smith had an object that defendant believed was a gun. Thus, defendant reasons there is insufficient evidence to support the gun specification convictions. See, generally, R.C. 2941.141[11]
(specification concerning possession of firearm essential to affect sentence) and R.C. 2941.145[12] (specification concerning use of firearm to facilitate offense).
 {¶ 114} Although when defendant went to the apartment complex where LaToya Dixon lived he may or may not have known that any of his companions were armed with a gun, based upon the events that occurred in Emmitt Grant's apartment, in which a gun fell to the floor and someone screamed, "`Get your gun, get your gun. * * * He's about to get your gun.'" (Tr. 38), we find a trier of fact could reasonably infer that during the assault of Grant and prior to the shooting of John Hill, defendant had knowledge that at least one of his companions was armed with a gun. Therefore, defendant's claim that he lacked knowledge that any of his companions had a gun is not persuasive.
 {¶ 115} In State v. Chapman (1986), 21 Ohio St.3d 41, the Supreme Court of Ohio held that "[a]n individual indicted for and convicted of R.C. 2911.01, aggravated robbery, and R.C. 2941.141, a firearm specification, is subject to a mandatory three-year term of actual incarceration under R.C. 2929.71, regardless of whether he was the principal offender or an unarmed accomplice." Id. at syllabus, following State v. Moore (1985),16 Ohio St.3d 30. In Chapman, the Supreme Court of Ohio applied former R.C.2923.03(F), which provided that "`[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principaloffender. * * * A charge of complicity may be stated in terms of this section, or in terms of the principal offense[,]'" id. at 42 (emphasis sic.), and concluded that the appellant was properly "`punished as if he were a principal offender.'" Id. Cf. current version of R.C. 2923.03(F)[13] (providing that "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense").
 {¶ 116} Here there is evidence, if believed by the trier of fact, that establishes that one of defendant's companions had a gun when the crimes for which defendant was convicted were committed in Emmit Grant's apartment. Furthermore, based upon the evidence, a trier of fact reasonably could infer that John Hill's death occurred in propinquity to the crimes that were committed in Grant's apartment. Because John Hill's death resulted from gunshot wounds and Hill's death occurred in propinquity to the crimes that were committed in Grant's apartment, a trier of fact reasonably could conclude that the principal offender had a firearm on or about him when he murdered John Hill and, alternatively, the principal offender brandished a firearm when he shot John Hill.
 {¶ 117} Therefore, even assuming defendant himself did not possess a firearm, we find sufficient evidence to support the proposition that at least one of defendant's companions had a firearm on or about his person at the time the crimes occurred for which defendant was charged and later convicted.
 {¶ 118} Consequently, having previously concluded sufficient evidence exists to support the convictions from which defendant appeals and observing defendant does not challenge the convictions related to counts 1, 4, 5, and 9, even if defendant was unarmed as he claims, applying R.C. 2923.03(F) and the reasoning of Chapman, we conclude that there is sufficient evidence to support the gun specifications for which defendant was convicted.
 {¶ 119} Therefore, defendant's contention that there is insufficient evidence to support defendant's gun specification convictions is not well-taken.
 {¶ 120} Accordingly, because defendant does not challenge his convictions related to count 1 (aggravated burglary of Emmitt Grant); count 4 (felonious assault of Emmitt Grant); count 5 (aggravated burglary concerning the Hill brothers); and count 9 (felonious assault of Jerramie Hill), and having rejected defendant's challenges to count 2 (aggravated robbery of Emmitt Grant); count 3 (attempted murder of Emmitt Grant); count 6 (aggravated robbery of Jerramie Hill); count 7 (aggravated robbery of John Hill); count 8 (attempted murder of Jerramie Hill); count 10 (aggravated murder of John Hill); and count 11 (aggravated murder of John Hill), and having rejected defendant's challenge to the guns specification convictions, we therefore overrule defendant's first assignment of error.
 {¶ 121} Defendant's second assignment of error asserts the trial court erred when it sentenced defendant to aggravated murder because the trial court's judgment entry stated that defendant was guilty of attempted aggravated murder. Defendant requests this court reverse the trial court's judgment and remand the case for resentencing.
 {¶ 122} For its part, the state contends the error in the judgment entry is a clerical error and constitutes harmless error. See, generally, Crim.R. 52(A) (providing that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"). The state urges this court to strike the mistaken matter and affirm the modified judgment.
 {¶ 123} Here, counts 10 and 11 of the indictment charged defendant with aggravated murder, which is codified at R.C.2903.01. Furthermore, in its verdict, the three-judge panel found defendant guilty of two counts of aggravated murder as charged in the indictment.
 {¶ 124} However, the trial court in its judgment entry of January 15, 2003, found defendant guilty of "[c]ount Ten of the Indictment, to wit: Aggravated Murder with Specifications, in violation of R.C. 2923.02 " and of "[c]ount Eleven of the Indictment, to wit: Aggravated Murder with Specifications, in violation of R.C. 2923.02 * * *." (Emphasis added.) See, generally, R.C. 2923.02 (attempt).
 {¶ 125} Here, the trial court's reference in its judgment entry to R.C. 2923.02, attempt, rather than to R.C. 2903.01, aggravated murder, appears to be a clerical mistake, especially given the three-judge panel's verdict that found defendant guilty of aggravated murder as charged in the indictment and given counts 10 and 11 of the indictment that charged defendant with aggravated murder.
 {¶ 126} Crim.R. 36 provides that "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." Because Crim.R. 36 provides that a trial court may at any time correct errors in the record arising from oversight or omission, we conclude that remanding the case to the trial court to correct its sentencing entry is appropriate. See, e.g., State v. Lattimore (Feb. 22, 2002), Hamilton App. No. C-010488 (remanding matter to trial court to correct typographical error in judgment entry); State v.Silguero, Franklin App. No. 02AP-234, 2002-Ohio-6103, at ¶ 14, appeal not allowed (2003), 98 Ohio St.3d 1490, 2003-Ohio-1189
(remanding matter to trial court to correct clerical error in judgment entry to reflect the offense for which defendant was convicted).
 {¶ 127} Therefore, defendant's second assignment of error is sustained but only to the extent that the trial court committed a typographical error in its judgment entry, and the cause should be remanded to the trial court to correct its typographical error.
 {¶ 128} Accordingly, having overruled defendant's first assignment of error and having sustained in limited part defendant's second assignment of error, we therefore affirm the judgment of the Franklin County Court of Common Pleas and remand this cause to that court to correct the typographical error in its judgment entry of January 15, 2003, to reflect the offenses for which defendant was convicted.
Judgment affirmed and cause remanded with instructions.
Sadler, J., concurs.
RYANT, J., concurs in part; dissents in part.
[1] Regarding the convictions for aggravated murder, a three-judge panel, as the trier of fact, found defendant was not the principal offender in the commission of aggravated murder and aggravated murder was not committed with prior calculation.
[2] At trial, the following witnesses testified on behalf of the state: Emmitt Grant, LaToya Dixon, Officer Patrick Seaman, Officer Mark L. Henson, Jerramie L. Hill, Detective Carl Rankin, and Dorothy Dean, D.O.
[3] See Miranda v. Arizona (1966), 384 U.S. 436, 471,86 S.Ct. 1602 (holding that a person held for interrogation must be clearly informed that he or she has the right to consult with a lawyer and to have the lawyer with him or her during interrogation). See, also, Dickerson v. United States (2000),530 U.S. 428, 432, 120 S.Ct. 2326 (declining to overruleMiranda and holding that Miranda, being a constitutional decision, may not be in effect overruled by an Act of Congress, and Miranda and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts).
[4] At trial, the following witnesses testified on behalf of defendant: Tom Stanley, Detective Edward J. Cox, Officer Aaron Dennis, and Cortez R. Smith.
[5] In defendant's first assignment of error, defendant challenged his convictions as unsupported by sufficient evidence and as against the manifest weight of the evidence. However, the assignment of error as actually argued only challenged the sufficiency of the evidence. See, also, Defendant's Reply Brief, at 4. Accordingly, in this opinion we only review defendant's challenge to the sufficiency of the evidence.
[6] Am.Sub.H.B. No. 327 amended R.C. 2913.01 effective July 8, 2002, and Am.Sub.S.B. No. 82 amended R.C. 2913.01 effective February 12, 2004. Division (K) was unaffected by these amendments.
[7] Am.Sub.H.B. No. 12 amended R.C. 2923.11 effective April 8, 2004. Division (A) was unaffected by this amendment.
[8] Pursuant to R.C. 2911.11:
"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
"(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
"(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
"(B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree.
"(C) As used in this section:
"(1) "Occupied structure" has the same meaning as in section2909.01 of the Revised Code.
"(2) `Deadly weapon' and `dangerous ordnance' have the same meanings as in section 2923.11 of the Revised Code."
[9] Sub.S.B. No. 184 subsequently amended R.C. 2903.01
effective May 15, 2002, by inserting "terrorism" in division (B) and making other nonsubstantive changes in division (B).
[10] Paragraphs 11 and 12 of Lockett were also overruled byState v. Downs (1977), 51 Ohio St.2d 47, paragraph one of the syllabus, judgment vacated (1978), 438 U.S. 909, 98 S.Ct. 3133, insofar as it left undisturbed the death penalty.
[11] Am.Sub.S.B. No. 179 amended R.C. 2941.141 effective January 1, 2002, by adding new division (C) and redesignating former divisions (C) and (D).
[12] Am.Sub.S.B. No. 179 amended R.C. 2941.145 effective January 1, 2002, by adding new division (C) and redesignating former divisions (C) and (D).
[13] Chapman construed a former version of R.C. 2923.03. Effective September 17, 1986, H.B. No. 338 amended former R.C.2923.03, which had been applied by the Chapman court. However, division (F) of former R.C. 2923.03, which had been applied byChapman, was unaffected by H.B. No. 338.