OPINION
{¶ 1} Defendant-appellant, Nina Mercado (hereinafter "Mercado"), appeals the judgment of the Marion Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} On May 26, 2006, two altercations occurred between two rival groups. The first group was known as the "Chicago" group, or the group from the yellow house at 684 North State Street, and included: Nina Mercado, Eric Mercado (Mercado's brother), Shonte Boswell (Mercado's boyfriend), Jonathan Stanley, and Justin Stanley (Jonathan Stanley's brother). The second group was known as the "Detroit" group, or the group from the white house at 736 North State Street, and included: Ray Otis Craighead, Jason Craighead, Terell Steen, and Brandon Black.
 {¶ 3} The police received a call regarding the first incident at approximately 4:33 p.m. (Tr. Oct. 2-4, 2006, Vol. II at 256). While on the scene, Patrolman Winfield, a police officer with the Marion Police Department, arrested Jonathan Stanley on a warrant for an unrelated matter. (Tr. Oct. 2-4, 2006, Vol. I at 129; 136). The police officers cleared the scene and returned to the police station at approximately 4:53 p.m. (Id. at 137). The police received a subsequent call regarding a second incident at approximately 5:04 p.m. Shortly thereafter, the *Page 3 
police received a 911 call that shots were fired, and police reported to the scene. (Id at 258). During the second incident, gun shots were fired and Ray Otis Craighead was shot. (Id. at 381-382).
 {¶ 4} The Marion County Grand Jury indicted Mercado on the following: count one of aggravated riot, in violation of R.C. 2917.02(A)(2), a fourth degree felony; and count two of inciting to violence, in violation of R.C. 2917.01(A)(1), a third degree felony. The indictment included a three year firearm specification as to counts one and two under R.C. 2941.145/2929.14(D).
 {¶ 5} A jury trial was held, and the jury found Mercado guilty on both counts. In addition, the jury found Mercado guilty of both firearm specifications.
 {¶ 6} On December 12, 2006, the trial court sentenced Mercado to twelve months imprisonment on count one and one year imprisonment on count two. For the firearm specification, the trial court sentenced Mercado to a mandatory term of three years imprisonment. The trial court further ordered that counts one and two be served concurrently to each other, but consecutively to the three year firearm specification, for an aggregate prison sentence of four years.
 {¶ 7} It is from this judgment that Mercado appeals and presents nine assignments of error for our review. For clarity of analysis, we have combined Mercado's assignments of error where appropriate. *Page 4 
 ASSIGNMENT OF ERROR NO. I THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR INCITING TO VIOLENCE.
 ASSIGNMENT OF ERROR NO. II DEFENDANT-APPELLANT'S CONVICTION FOR INCITING TO VIOLENCE IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 8} In her first assignment of error, Mercado argues the evidence failed to show that she knowingly engaged in conduct designed to urge or incite another to engage in an offense of violence. Mercado argues in her second assignment of error that her conviction for inciting to violence is against the manifest weight of the evidence.
 {¶ 9} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 10} However, when determining whether a conviction is against the manifest weight of the evidence a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier *Page 5 
of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin (1983), 20 Ohio App. 3d 172, 175,485 N.E.2d 717.
 {¶ 11} R.C. 2917.01, inciting to violence, provides in pertinent part:
 (A) No person shall knowingly engage in conduct designed to urge or incite another to commit any offense of violence when either of the following apply:
 (1) The conduct takes place under circumstances that create a clear and present danger that any offense of violence will be committed;
 (2) The conduct proximately results in the commission of any offense of violence.
 (B) Whoever violates this section is guilty of inciting to violence. If the offense of violence that the other person is being urged or incited to commit is a misdemeanor, inciting to violence is a misdemeanor of the first degree. If the offense of violence that the other person is being urged or incited to commit is a felony, inciting to violence is a felony of the third degree.
 {¶ 12} An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 13} Patrolman Lantz, was employed by the Marion City Police Department and was on duty on May 26. (Tr. Oct. 2-4, 2006, Vol. 1 at 128-29.) *Page 6 
Patrolman Lantz went to 736 North State Street, and at that residence was: Ray and Jason Craighead, Terrell Stevens, and Bandon Black. (Id. at 129-130). An older white gentleman and a white female were also at the house. (Id. at 131). Patrolman Lantz was unable to ascertain what the disturbance was about and was directed to 684 North State Street where Mercado, Eric Mercado, Jonathan Stanley, and Shonte Boswell were located. (Id. at 132-33). According to Patrolman Lantz, he talked to Mercado who advised that "she didn't see anybody with a gun, and there wasn't even a gun at the house." (Id. at 134). Both houses were blaming the other house for the disturbance. (Id. at 134). Patrolman Winfield, who also went to the residences, arrested Jonathan Stanley on an outstanding warrant that was unrelated to this incident. (Id. at 129; 136). Patrolman Lantz cleared the scene at 4:53 and went back to the station. (Id. at 137)
 {¶ 14} On cross-examination, Patrolman Lantz testified that Mercado said "she didn't see a weapon, said that there was none in the house." (Id. at 139).
 {¶ 15} Peggy Davis, Terry Davis, and Kenny McDole were laying carpet at Melissa Lucas' house located at 736 North State Street on May 26. (Id. at 140-141). Peggy Davis was standing on the front porch when the first disturbance began and testified that there were four black males from 736 North State Street involved and that they were fighting with six or seven guys from another house. *Page 7 
(Id. at 143-144). Davis testified, "[t]hey were cussing, they were hollering whose turf it was and about the dealing and drugs going on there." In addition, Davis testified:
 There was a gentleman down at the other end, he was raising his hands up like this. To me the object that I saw did look like a gun type object that was swaying in the air. It did look like an object like that. It could have been a pipe, but to me it looked like the shape of a gun. One of the black people down there where we was laying carpet at was yelling `put the piece down, let's fight like real men.'
(Id. at 145).
 {¶ 16} After the police left, a second fight broke out. (Id. at 150). Davis further testified, "[w]hat I saw was a — I don't know what kind of car it is, it's like a mint green, nice, SUV, and it was a Mexican guy driving the car that had pulled up on the other side. * * *what I saw was a sack handed out on the passenger's side to one of the boys down the street. (Tr. at 154). Davis testified that the person who did the shooting was part white and part Mexican and she saw someone hand him the gun. (Id.) The person who was handed the gun walked up towards the fight and he started shooting the gun and was not aiming the gun. (Id. at 155). Further, Davis testified, "[l]ike I said, his back was turned like this and he had the gun behind him like this and was shooting it just — fortunately the black guy got him, he was not aiming at no one. He was just shooting it wherever he could shoot it." (Id.) *Page 8 
 {¶ 17} Davis testified that there was two guys hitting Mercado's brother and Mercado was yelling and cussing profanity and was there trying to protect her brother. (Id. at 150).
 {¶ 18} Cheri Baer, who lives at 722 North State Street, testified that after the police officer left, she heard some more yelling about seven minutes later. (Tr. October 2-4, 2006, Vol II at 264; 266). Baer testified that she heard a woman's voice yelling, "`[g]et those mother-f***ers.'" (Id. at 266). Baer knew it was a woman's voice, but did not know whose voice it was. (Id.). Baer testified that she heard a couple of times" `put your gun away and we'll come down here.'" (Id. at 267). Baer saw between ten and fourteen people in the fight, and there were two women in the fight. (Id. at 269-270).
 {¶ 19} Krista McCarty testified that the second time she heard a lot of guys' voices and some girls voices yelling, and the girls were yelling "`we'll go down there and get `em, go get `em.'" (Id. at 278). McCarty does not know who said "go get `em." (Id. at 282). When the fighting was starting to get worse, a skinny girl and a heavier set girl tried to get into the fight, they were "sort of trying to pull people off of other people." (Id. at 279-280). Both the girls got hit and then a few seconds later shots went off. (Id. at 280).
 {¶ 20} Latoya Jones got a phone call from Justin Stanley asking her to give him a ride over to his brother's house on North State Street. (Tr. October 2-4 Vol. *Page 9 
I at 192-193). Jones testified that Randi Sparks drove with her and she rode in the passenger seat to pick up Justin. Jones testified that Justin had received a cell phone call and Justin said that he was on his way. (Id. at 197-199).
 {¶ 21} Jones testified that when they were getting out of the car, Mercado was "telling Jessie [Justin] that the Detroit boys that were up the street were messing with his brother. The cops ended up being called and he got tooken [sic] to jail for an old warrant that he had." (Tr. October 2-4, Vol. II at 205). Jones testified regarding Justin's reaction and stated that Justin was mad and "when he got out the car that's the first thing he did was look up the street and see if they were out there and they were. And — — I mean, he was cursing and stuff, but — ." (Id. at 208).
 {¶ 22} Further, Jones testified after she and Randi Sparks pulled around to the alley, Brandon Black and Jason Craighead were standing on the porch and Black had a gun.[1] (Id. at 212). Jones testified that Brandon Black was "flashing" the gun on the porch at 736 North State Street and making a demonstration to Nina Mercado, Shonte Boswell, Eric Mercado, Beau Reyes, Junior, and Cory Temple.[2] (Id. at 213-214). *Page 10 
 {¶ 23} According to Jones, once they started walking toward the middle of the street, Ray Otis Craighead told Black to put the gun up so Black ran into the house and came back out. (Id. at 212).
 {¶ 24} Jones testified that Junior was still at the house when there was fighting and brought the gun to Pothead, a.k.a Shonte Boswell. (Id. at 219; 205). Jones testified that Boswell started shooting. (Id. at 220). Jones testified that she started running when the shots were fired, and that she, Mercado, Randi, and a girl named Felicia, who was in the car the entire time, went to Wyandot where Mercado's mom was working. (Id. at 221).
 {¶ 25} Amber Christian testified that she was at Lora Workman's house on Harrison Street watching a movie when she heard yelling back and forth between people, and then they broke out into a fight. (Id. at 283-285). Christian testified that there were about twelve people involved and probably three of those people were females. (Id. at 286). In addition, Christian testified that the women were walking down the street and some of them were yelling, and she saw Mercado attempting to break up the fighting. (Id. at 287-88; 292).
 {¶ 26} Charmion Faggs, who lived at 721 North State Street, testified that she saw Mercado standing at the corner of Harrison Street by the telephone pole hollering "`the Police are coming, the Police are coming.'" (Id. at 327) Charmion testified that the guys kept on arguing, and "I don't know what they said to Nina *Page 11 
[Mercado], but her and two other girls ran down there after all the guys got to fighting, she ran and her and the two girls ran in and jumped in the fight, too." (Id. at 328).
 {¶ 27} Sean Faggs, also lived at 721 North State Street, and testified that he was asleep on the couch when his sister Charmion came running into the house and told him to get up because there were people fighting. (Id. at 343). Sean testified that he saw a total of maybe fourteen people in different groups arguing and threatening each other. (Id.). Sean testified that the Marion/Chicago group had started going to their house and a few of the Detroit guys had went inside of the white house, when one guy from the Marion/Chicago group ran back up and everybody else followed him back up. (Id. at 346-347). According to Sean, Mercado came up with the rest of the group and one of the guys from the Detroit group punched her. (Id. at 347). Everybody started fighting each other and a guy put his hand in his pocket to go for a gun. (Id. at 349). Sean testified that a guy running from the rear pulled out a gun and shot maybe six or seven times, a big guy got hit with a bullet, and everybody else ran except Sean, the guy shooting, and the guy who got shot. (Id. at 349-350). Sean testified that Mercado had a mark under her eye which he saw before the punch, but then she got punched in the same eye. (Id. at 350). *Page 12 
 {¶ 28} Mercado was convicted of inciting to violence. The offenses of violence in this case included felonious assault and improperly discharging a firearm at or into a habitation.
 {¶ 29} The felonious assault statute provides: "(A) [n]o person shall knowingly do either of the following: (1) [c]ause serious physical harm to another or to another's unborn; (2) [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance." R.C. 2903.11. While R.C. 2923.161, improperly discharging a firearm at or into a habitation, states, in pertinent part: "(A) [n]o person, without privilege to do so, shall knowingly do any of the following: (1) [discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."
 {¶ 30} As previously noted, an individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 31} Mercado told Justin Stanley, Jonathan Stanley's brother, that "the Detroit boys that were up the street were messing with his brother. The cops ended up being called and he got tooken [sic] to jail for an old warrant that he had." (Id. at 205). Mercado knew of the first altercation between the "Chicago group" and the "Detroit group", and that law enforcement officers were involved *Page 13 
with the first altercation when she made the statement to Justin Stanley. In fact, Mercado had talked to the police after the first altercation had occurred.
 {¶ 32} Mercado did not merely inform Justin that his brother Jonathan had been arrested, but rather, told Justin that the "Detroit boys" were messing with Justin's brother. (See Id. at 205). Her statement to Justin Stanley that the "Detroit boys" were "messing with his brother" may have been true but were not offered for their factual basis but instead to incite and inflame Justin Stanley. Given the previous fight between the "Detroit" and "Chicago" groups and the obvious animosity between the two groups, Mercado was aware that her statements would probably cause a certain result, i.e. another fight.
 {¶ 33} Moreover, although no one testified that Mercado stated "let's get `em" and "get those mother f***ers", there was testimony that there were two or three women involved in the fight, a woman made the statements, and Mercado was involved in the fight. Therefore, circumstantial evidence existed from which the jury could infer that Mercado knowingly made statements which were designed to incite another to commit an offense of violence. Circumstantial evidence and direct evidence have the same probative value. Jenks, 61 Ohio St.3d 259, at paragraph one of the syllabus; State v. Bridges, 3d Dist. No. 1-06-30,2007-Ohio-1764, ¶ 28 citing Jenks, supra.; State v. Mitchner, 3d Dist. No. 15-05-07, 2005-Ohio-6412, ¶ 18. *Page 14 
 {¶ 34} Jones also testified that Brandon Black, a member of the "Detroit" group, had "flashed" a gun and made a demonstration to Mercado. (Id. at 213-214). Thus, Mercado's actions took place under circumstances, including a previous altercation between two rival groups and the fact that there was a gun "flashed" by a member of the "Detroit" group, which created a clear and present danger that an offense of violence would be committed.
 {¶ 35} After reviewing the record, in a light most favorable to the prosecution, we find that there was sufficient evidence in the record for the jury to find Mercado guilty of inciting to violence. Moreover, the record does not establish that the jury clearly lost its way or created a miscarriage of justice when it found Mercado guilty of inciting to violence.
 {¶ 36} Mercado's first and second assignments of error are, therefore, overruled.
 ASSIGNMENT OF ERROR NO. III THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR THE AGGRAVATED RIOT.
 ASSIGNMENT OF ERROR NO. IV DEFENDANT-APPELLANT'S CONVICTION FOR AGGRAVATED RIOT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE. *Page 15 
 {¶ 37} In her third assignment of error, Mercado maintains that there was insufficient evidence to convict her of aggravated riot. Mercado, in her fourth assignment of error, maintains that her conviction for aggravated riot is against the manifest weight of the evidence.
 {¶ 38} We previously discussed the applicable legal standards for sufficiency of the evidence and manifest weight of the evidence claims in Mercado's first and second assignments of error.
 {¶ 39} R.C. 2917.02, aggravated riot, provides in pertinent part:
 (A) No person shall participate with four or more others in a course of disorderly conduct in violation of section 2917.11 of the Revised Code:
 * * *
 (2) With purpose to commit or facilitate the commission of any offense of violence;
 * * *
 (C) Whoever violates this section is guilty of aggravated riot. A violation of division (A)(1) or (3) of this section is a felony of the fifth degree. A violation of division (A)(2) or (B)(1) of this section is a felony of the fourth degree. * * *
 {¶ 40} In addition, disorderly conduct under R.C. 2917.11 states in pertinent part:
 (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
 (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
 (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person; *Page 16 
 (3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;
 * * *
 {¶ 41} Christian testified that there were about twelve people, and Baer testified that there were between ten and fourteen people in the fight. (Tr. Oct. 2-4. 2006, Vol. II at 285; 269). Thus, there were clearly more than four individuals engaged in fighting. Mercado recklessly caused inconvenience, annoyance, or alarm by engaging in fighting during the second altercation. Thus, Mercado participated with four or more people in a course of disorderly conduct.
 {¶ 42} Mercado was involved in the fighting during the second altercation and was on the same side of the fight as Shonte Boswell. Jones testified that Junior was at the house when the fighting began during the second altercation, and that Junior brought a gun to Boswell. (Id. at 219; 205). Boswell then shot the gun. (Id.). There is enough evidence on the record for the jury to infer that Mercado was fighting with the purpose to facilitate the commission of an offense of violence, that being felonious assault.
 {¶ 43} After reviewing the record, in a light most favorable to the prosecution, we find there was sufficient evidence for the jury to find Mercado guilty of aggravated riot under R.C. 2917.02. Furthermore, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice when it found Mercado guilty of aggravated riot. *Page 17 
 {¶ 44} Mercado's third and fourth assignments of error are, therefore, overruled.
 ASSIGNMENT OF ERROR NO. V THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR FIREARM SPECIFICATIONS.
 ASSIGNMENT OF ERROR NO. VI DEFENDANT-APPELLANT'S CONVICTION FOR FIREARM SPECIFICATIONS IS CONTARY TO THE MANIFEST WEIGHT OF EVIDENCE.
 {¶ 45} In her fifth assignment of error, Mercado maintains that the record was insufficient to support her conviction for a firearm specification. According to Mercado, the record does not establish that she had any knowledge of or connection to the gun; she was not an accomplice with Shonte Boswell; and she did no overt acts in furtherance of the crime. In her sixth assignment of error, Mercado maintains that her conviction for a firearm specification is against the manifest weight of the evidence.
 {¶ 46} Under R.C. 2941.145(A), "Imposition of a three-year mandatory prison term upon an offender under division (D)(1)(a) of section 2929.14
of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the *Page 18 
offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. * * *." R.C. 2923.03, complicity, provides:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 (B) (1) Solicit or procure another to commit the offense;
 (2) Aid or abet another in committing the offense;
 (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 (4) Cause an innocent or irresponsible person to commit the offense.
 {¶ 47} The Ohio Supreme Court has held that an unarmed accomplice can be convicted of aggravated robbery and a firearm specification "regardless of whether he was the principal offender or an unarmed accomplice." State v. Chapman (1986), 21 Ohio St.3d 41, 487 N.E.2d 566, syllabus; See also, State v. Brown, 10th Dist. No. 03-AP-130,2004-Ohio-2990, ¶¶ 114-117.
 {¶ 48} There is no evidence in the record that Mercado possessed a firearm during either altercation. Davis testified that during the first altercation she saw a "gentleman down at the other end" raising his hands with what looked like a "gun type object." (Tr. Oct. 2-4, 2006, Vol. I at 145). Davis also testified that she heard a black person from 736 North State Street "yelling `put the piece down, let's fight like real men.'" (Id.).
 {¶ 49} Jones testified that Junior was still at the house when there was fighting and brought the gun to Shonte Boswell, and Boswell began shooting. (Tr. *Page 19 
Oct. 2-4, 2006, Vol. II at 219; 205). The evidence clearly indicates that Shonte Boswell possessed a firearm and used the firearm during the second fight. (Id. at 219-220; 205). Mercado got involved in the fight wherein Boswell fired a gun, and was fighting on the same side as Boswell and other members of the "Chicago group."
 {¶ 50} Accordingly, we find there was sufficient evidence for the jury to find Mercado guilty of the firearm specification. Moreover, after reviewing the record, we cannot find that the jury lost its way or created a manifest injustice when it found Mercado guilty of the firearm specification.
 {¶ 51} Mercado's fifth and sixth assignment of error are, therefore, overruled.
 ASSIGNMENT OF ERROR NO. VII PROSECUTORIAL MISCONDUCT RENDERED DEFENDANT-APPELLANT'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF THE CONSTITUTIONS OF OHIO AND THE UNITED STATES.
 {¶ 52} In her seventh assignment of error, Mercado argues that prosecutorial misconduct rendered her trial unfair. Specifically, Mercado alleges that the prosecutor argued that she placed a telephone call to Justin Stanley; however, the record contains no evidence in support. Mercado further maintains that this misconduct constituted plain error. *Page 20 
 {¶ 53} In analyzing this assignment of error, we must first note that Mercado's attorney did not object during the prosecutor's closing arguments. "Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim. R. 52(B). Thus, we must determine whether the prosecutor's conduct constituted plain error.
 {¶ 54} Under the plain error standard, an appellant must demonstrate that the outcome of his trial would clearly have been different but for the errors that he alleges. State v. Waddell (1996), 75 Ohio St.3d 163,166, 661 N.E.2d 1043, citing State v. Moreland (1990), 50 Ohio St.3d 58,63, 552 N.E.2d 894.
 {¶ 55} In the prosecuting attorney's closing arguments, the prosecutor argued: Justin Stanley received a telephone call, Justin said that he'll be right there, and that it was obvious that someone from North State Street made the telephone call. (Tr. Oct. 2-4, 2006, Vol. II at 419). In the defense counsel's closing arguments, defense counsel referred to a powerpoint which indicated "that the Defendant places a call to Jessie", and defense counsel argued, "well, that's not the evidence. Latoya said Jessie got a phone call, but she didn't know who made the phone call, then they went to the house.* * *." (Id. at 428).[3]
 {¶ 56} When Justin Stanley arrived at the house on North State Street, Mercado told him "that the Detroit boys that were up the street were messing with *Page 21 
his brother. The cops ended up being called and he got token [sic] to jail for an old warrant that he had." (Id. at 205). Given the testimony that Mercado made the aforementioned statement to Justin and Mercado's involvement in the fight, we cannot find that the outcome of Mercado's trial would have clearly been different but for the prosecution's statements regarding the telephone call being placed from someone on North State Street or the powerpoint statement that Mercado placed a telephone call to Justin Stanley.
 {¶ 57} Accordingly, we find that Mercado's seventh assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. VIII DEFENDANT-APPELLANT RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HER SIXTH AND FOURTEENTH AMENDMENT RIGHTS, AS WELL AS HER RIGHTS UNDER SECTION 10, ARTICLE I, OHIO CONSTITUTION.
 {¶ 58} In her eighth assignment of error, Mercado argues that she was provided ineffective assistance of trial counsel because trial counsel failed to object to the misconduct of the prosecutor, and trial counsel failed to argue or request an instruction that appellant renunciated any criminal purpose shared with Shonte Boswell and terminated any complicity with him.
 {¶ 59} "It is well-settled that in order to establish a claim of ineffective assistance of counsel, appellant must show two components: (1) counsel's *Page 22 
performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defense." State v.Price, 3d Dist. No. 13-05-03, 2006-Ohio-4192, ¶ 6, citing State v.Kole (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citingStrickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "To warrant reversal, the appellant must show that there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different." Id., citingStrickland, 466 U.S. at 687.
 {¶ 60} In Mercado's previous assignment of error, we determined that the outcome of her trial would not clearly have been different but for the prosecutor's comments. Similarly, we find that Mercado has failed to show that there is a reasonable probability that but for her trial counsel's failure to object to the prosecutor's alleged misconduct that the result of Mercado's trial would have been different. Thus, Mercado's ineffective assistance of counsel argument, in this regard, lacks merit.
 {¶ 61} Mercado also argues that trial counsel was ineffective because trial counsel failed to make an argument or request an instruction that Mercado renunciated any criminal purpose shared with Shonte Boswell, and terminated any complicity.
 {¶ 62} There was no evidence in the record that Mercardo renunciated any criminal purpose or terminated any complicity. Mercado got involved in the fight *Page 23 
and was knocked down when she was struck during the fight. There is nothing to indicate the Mercado voluntarily renunciated or terminated any complicity with Boswell. Thus, Mercado's trial counsel was not ineffective when it did not argue renunciation or that Mercado terminated any complicity with Boswell.
 {¶ 63} Mercado's eighth assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. IX THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT, PREVENTING THE APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION, REQUIRING REVERSAL OF THE APPELLANT'S CONVICTION AND A NEW TRIAL.
 {¶ 64} In Mercado's tenth assignment of error, she argues that the effect of the errors was cumulative and prejudicial, and thus, denied her a fair trial.
 {¶ 65} "Pursuant to the doctrine of cumulative error, `a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though numerous instances of trial court error does not individually constitute cause for reversal.'" State v. Brown, 7th Dist. No. 03-MA-32,2005-Ohio-2939, at ¶ 97, quoting State v. Garner (1995),74 Ohio St.3d 49, 64, 656 N.E.2d 623. The cumulative error doctrine "is not *Page 24 
applicable to a case where the court fails to find multiple instances of harmless error." Id., citing Garner, 74 Ohio St.3d at 64.
 {¶ 66} After reviewing the record, we cannot find that there were cumulative errors in Mercado's trial, or that the effect of the cumulative errors deprived Mercado of the right to a fair trial. Accordingly, we find that the doctrine of cumulative errors does not apply in this case.
 {¶ 67} Mercado's ninth assignment of error is, therefore, overruled.
 {¶ 68} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 SHAW, P.J., concurs. ROGERS, J., dissents.
[1] During Jones' testimony, she referred to many individuals by nicknames; however, we use the individuals names that Jones said corresponded with the various nicknames. (Tr. at 209; 212).
[2] Junior's last name was not identified in the record.
[3] This court simply notes that we do not have a copy of the powerpoint in the record.